# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| AGSPRING HOLDCO, LLC, a Delaware limited liability company; AGSPRING, LLC, a Delaware limited liability company; LVS II SPE XVIII LLC, a Delaware limited liability company; HVS V LLC, a Delaware limited liability company; and TOBI XXI LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2019-0567-AGB |
| NGP X US HOLDINGS, L.P., a Delaware limited partnership; RANDAL L. LINVILLE and BRADLEY K. CLARK, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: April 16, 2020
Date Decided: July 30, 2020

Joseph C. Schoell, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Jane E. Maschka, FAEGRE DRINKER BIDDLE & REATH LLP, Minneapolis, Minnesota; Jacob D. Bylund and David W. Creasey, FAEGRE DRINKER BIDDLE & REATH LLP, Des Moines, Iowa; *Attorneys for Plaintiffs.*

James M. Yoch, Jr. and Kevin P. Rickert, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Michael C. Holmes, Melissa L. James, R. Kent Piacenti, Meredith S. Jeanes, and Jared D. Wilkinson, VINSON & ELKINS LLP, Dallas, Texas; *Attorneys for Defendant NGP X US Holdings, L.P.*

Corinne Elise Amato and Eric J. Juray, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Todd W. Ruskamp and Daniel J. Schwaller, SHOOK, HARDY & BACON L.L.P., Kansas City, Missouri; *Attorneys for Defendants Randal L. Linville and Bradley K. Clark.*

**BOUCHARD, Chancellor**

This case concerns a transaction in which a private equity firm purchased all of the membership interests in Agspring LLC, a business that operates grain elevators, for nearly $300 million. Most of the consideration went to another private equity firm that held a 98% interest in Agspring. The transaction was structured so that Agspring's management team would continue to operate the business after closing, roll over their equity, and receive significant cash payments at closing.

The transaction closed in December 2015, in the midst of Agspring's 2016 fiscal year, which ended on May 31, 2016. As of closing, based on a financial model Agspring had provided to the buyer, the buyer understood that Agspring was projecting it would earn $33 million of EBITDA for its 2016 fiscal year.

In June 2016, Agspring reported that its total EBITDA for the 2016 fiscal year was only $701,900. Soon after, its top two officers gave notice of their resignations. Upon investigating the matter, the buyer allegedly learned that Agspring had concealed from the buyer that Agspring reduced its EBTIDA forecast for the 2016 fiscal year internally *before* the closing to just $20 million. Litigation followed, although the buyer did not file its initial complaint until April 2019.

The complaint in its current form asserts claims for fraud, aiding and abetting, conspiracy, breach of fiduciary duty, unjust enrichment, and indemnification against the seller and Agspring's top two officers. Defendants have moved to dismiss most of the claims as untimely and for failure to state a claim for relief.

1

For the reasons explained in this decision, the court grants the motion in part but denies it in the main. Most significantly, the court concludes that plaintiffs' claims were timely filed and that the complaint states a claim for fraud against all defendants.

## I.    BACKGROUND

The facts recited in this opinion come from the Verified Amended Complaint (the "Complaint") and documents incorporated therein.[1] Any additional facts are either not subject to reasonable dispute or are subject to judicial notice.

### A.    The Players

Plaintiff Agspring LLC ("Agspring" or the "Company") is a Delaware limited liability company that owned and operated several midstream agricultural commodity businesses, particularly grain elevators.[2] On December 14, 2015, American Infrastructure MLP Funds ("AIM"), a specialist private equity firm, and Agspring LP paid nearly $300 million to acquire the membership interests in Agspring (the "Transaction") pursuant to a Membership Interest Purchase and Contribution Agreement (the "MIPCA").[3]

---

[1] Verified Am. Compl. ("Compl.") (Dkt. 28). *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

[2] Compl. ¶¶ 6, 16, 33.

[3] *Id.* ¶¶ 2, 103; *id.* Ex. 1 ("MIPCA") § 2.6, Ex. C.

Plaintiff Agspring Holdco, LLC, a Delaware limited liability company, is currently the sole member of Agspring.[4] In September 2017, Agspring LP was converted into Agspring Holdco, LLC as part of a corporate restructuring.[5] For simplicity, this decision refers to these two entities interchangeably as "Holdco."

Plaintiffs LVS II SPE XVIII LLC ("LVS"), HVS V LLC ("HVS"), and TOBI XXI LLC ("TOBI") are Delaware limited liability companies.[6] LVS and HVS loaned a total of $80 million to Agspring under a Term Loan Agreement in connection with the Transaction.[7] HVS and TOBI purchased a total of $45 million of preferred equity in Holdco in connection with the Transaction, which Holdco used to purchase its interest in Agspring.[8] The Investor LLCs are managed by Pacific Investment Management Company LLC.[9] This decision refers to LVS, HVS, and TOBI collectively as the "Investor LLCs" and to Holdco, Agspring and the Investor LLCs collectively as "Plaintiffs."

Defendants Bradley Clark and Randal Linville founded Agspring in 2012, became its President and CEO, respectively, and served as two of the five members

---

[4] Compl. ¶ 14.

[5] *Id.*

[6] *Id.* ¶¶ 17-19.

[7] *Id.* ¶¶ 17-18.

[8] *Id.* ¶¶ 18-19.

[9] *Id.*

of Agspring's board.[10]   Before the Transaction closed, Clark and Linville held approximately 2% of the membership interests in Agspring.[11]   Clark and Linville continued to serve as Agspring's President and CEO for about seven months after the Transaction closed until they resigned effective July 25, 2016, shortly after the Company reported disastrous financial results for its 2016 fiscal year.[12]

Defendant NGP X US Holdings, L.P. ("NGP") is a Delaware limited partnership affiliated with private equity firm NGP Energy Capital Management.[13] Before the Transaction closed, NGP owned approximately 98% of the membership interests in Agspring and controlled Agspring's five-member board through its three designees:  Mark Zenuk, Cameron Dunn, and Richard Edwards (the "NGP Board Members").[14]

## B.    The Formation and Growth of Agspring

In August 2012, Clark and Linville formed Agspring with the aim of acquiring, consolidating, and operating midstream agricultural commodity firms.[15] NGP provided approximately 96% of the Company's initial capital ($150 million)

---

[10] *Id.* ¶¶ 21-22, 28.

[11] MIPCA at 1 (Second Recital).

[12] Compl. ¶¶ 21-22.

[13] *Id.* ¶ 20.

[14] *Id.* ¶¶ 20, 28.

[15] *Id.* ¶ 24.

and entered into an Advisory Services, Reimbursement and Indemnification Agreement with Agspring.[16] Under this agreement, NGP agreed to advise Agspring concerning, among other things, financing sources and mergers and acquisitions.[17]

In 2013, Agspring bought three grain handling businesses in the Mississippi River Delta, consolidating them as Big River Rice and Grain ("Big River").[18] Most of Big River's assets were purchased from Larry Tubbs for $29.5 million.[19] To finance the deal, an Agspring subsidiary—Agspring Mississippi Region, LLC ("Agspring Mississippi")—obtained a $7 million term loan from Tubbs in the form of a promissory note (the "Tubbs Note").[20] In September 2013 and February 2014, Agspring Mississippi sought two additional loans from Tubbs, each of which were executed through amendments to the Tubbs Note.[21]

After the two amendments, the total principal on the Tubbs Note was $22 million.[22] Under the Tubbs Note, Agspring Mississippi was required to pay

---

[16] *Id.* ¶¶ 27, 29, 31.

[17] *Id.* ¶ 31.

[18] *Id.* ¶ 32.

[19] *Id.* ¶ 34.

[20] *Id.* ¶ 35.

[21] *Id.* ¶ 36.

[22] *Id.* ¶ 37.

approximately $100,000 per month in interest, and the entire principal as a bullet payment in September 2023.[23] Agspring is a guarantor on the Tubbs Note.[24]

In 2014, Agspring acquired a number of businesses, including the Idaho grain operations of General Mills, which were rechristened as Thresher Artisan Wheat ("Thresher").[25] Big River and Thresher are in the same business of operating grain elevators.[26]

## C. NGP Seeks an Exit from Agspring

Although the Company had made a number of acquisitions, Clark and Linville complained to the NGP Board Members in 2014 that they needed more capital for their preferred acquisition strategy and recommended that NGP exit its investment in Agspring.[27] In September 2014, Clark and Linville pressed the issue again with the NGP Board Members at a board meeting.[28]

NGP authorized Clark and Linville to solicit letters of intent and told them it would be seeking an approximate two times return on its initial investment of $150

---

[23] *Id.*

[24] *Id.* ¶ 38.

[25] *Id.* ¶¶ 32, 39.

[26] *Id.* ¶ 33.

[27] *Id.* ¶ 41.

[28] *Id.* ¶ 42.

million.[29]  Clark, Linville, NGP, and the NGP Board Members then began working together to find a buyer to purchase Agspring for over $300 million.[30]

### D.    AIM Negotiates with NGP to Acquire Agspring

In January 2015, AIM expressed an interest in acquiring Agspring, and in March, AIM offered a nonbinding term sheet.[31]  In late May, AIM signed a term sheet with Clark, Linville, and NGP to purchase Agspring's operating subsidiaries for $325 million in cash.[32]

In May 2015, Clark and Linville discussed the EBITDA they believed Agspring operating subsidiaries could achieve for the 2016 fiscal year, which ran from June 1, 2015 to May 31, 2016 ("FY16").[33]  Clark and Linville initially suggested a total FY16 EBITDA for Agspring of $40 million.[34]  Based on these discussions, the Company's financial model projected total FY16 EBITDA of $38 million, with Big River accounting for $16 million of the total.[35]

In mid-July 2015, AIM sought a price reduction based on diligence findings regarding Agspring's actual and projected earnings and asked to exclude certain

---

[29] *Id.* ¶¶ 42-43.

[30] *Id.* ¶ 44.

[31] *Id.* ¶ 46.

[32] *Id.* ¶¶ 46-47.

[33] *Id.* ¶¶ 56, 116.

[34] *Id.* ¶ 56.

[35] *Id.* ¶ 61.

assets from the proposed transaction.[36]  NGP agreed to reduce the price by $5 million, to $320 million, and the parties executed a new nonbinding term sheet that contemplated a purchase of Agspring rather than its subsidiaries.[37]  The new term sheet contemplated funding by a combination of AIM equity, preferred investor equity, and new debt taken on by Agspring.[38]

During the summer and fall of 2015, Clark, Linville, and AIM secured preferred investor and lending financing for the proposed transaction.[39]  To obtain financing, Agspring was required to provide covenants to its lenders and preferred equity holders.[40]  One covenant made to the Investor LLCs was a requirement that the consolidated Agspring companies would not exceed a specified "Consolidated Leverage Ratio," which is the ratio between the debt of those companies and their EBITDA.[41]  Agspring also provided covenants on its minimum working capital and asset coverage ratio.[42]

In October 2015, Clark and Linville advised AIM that, because of reduced corn and soybean volumes, they expected Big River's FY16 EBITDA to be reduced

---

[36] *Id.* ¶ 49.

[37] *Id.* ¶¶ 49-50.

[38] *Id.* ¶ 50.

[39] *Id.*

[40] *Id.* ¶ 51.

[41] *Id.* ¶¶ 51-52.

[42] *Id.* ¶ 52.

by $3 million, from $16 million to $13 million.[43]  On or about November 4, 2015, Clark and Linville told AIM that they now expected Big River's 2016 EBITDA to miss its projections by another $3 million, implying 2016 EBITDA around $10 million for Big River.[44]  Based on Clark and Linville's $10 million projection for Big River's FY16 EBITDA, AIM and NGP agreed on a $25 million reduction of the purchase price.[45]

By November 2015, Thresher also was facing financial trouble.  Agspring's accountant noted that "Thresher had a large loss for the month that wiped out all of the YTD income."[46]  Clark and Linville lowered the internal projections for Thresher from $22 million to $15 million, but did not disclose the reduction to AIM before the Transaction closed.[47]  On November 25, Clark and Linville sent a financial model, financial information, and a certification to AIM and the Investor LLCs.[48] The financial model showed no change in Thresher's initial FY16 EBITDA ($22 million), the reduced forecast for Big River's FY16 EBITDA ($10 million), and total FY16 EBITDA of $33 million.[49]

---

[43] *Id.* ¶ 61.

[44] *Id.* ¶ 68.

[45] *Id.* ¶ 69.

[46] *Id.* ¶ 82.

[47] *Id.* ¶ 83.

[48] *Id.* ¶ 86.

[49] *Id.* ¶¶ 10, 77, 86-88, 116.

### E. The Closing and Discovery of Misrepresentations

On December 14, 2015, the Transaction closed.[50] The sale was effectuated by the MIPCA.[51] The parties to the MIPCA include, among others, Holdco's predecessor (Agspring LP), AIM, Agspring, NGP, and certain "Management Investors," which include Clark and Linville.[52]

The Transaction was financed with $45 million in preferred equity in Holdco from HVS and TOBI, and $80 million in loans to Agspring from LVS and HVS governed by a "Term Loan Agreement."[53] The parties to the Term Loan Agreement include Agspring, U.S. Bank National Association as administrative agent, and LVS and HVS as lenders.[54]

Agspring also entered into an asset-based working capital credit agreement with Macquarie Bank as administrative agent, issuing bank and as a lender (the "ABL Credit Agreement").[55] At times, this decision refers to the Term Loan

---

[50] *Id.* ¶ 103.

[51] *Id.* ¶ 4.

[52] *See* MIPCA, at Signature Pages.

[53] Compl. ¶¶ 104, 128; *see* Rickert Aff. Ex. 3 ("Term Loan Agreement") (Dkt. 58).

[54] Term Loan Agreement at AGS-AAA00012901-03 (Signature Pages).

[55] Compl. ¶ 125; *see* Rickert Aff. Ex. 4 ("ABL Credit Agreement").

Agreement and ABL Credit Agreement together as the "Credit Agreements." Clark signed both of the Credit Agreements on behalf of Agspring.[56]

In connection with the Transaction, Clark and Linville contributed their interests in Agspring (valued at $5.4 million in total) and received in exchange cash payments of approximately $3.8 million and $3.7 million, respectively, as well as equity interests in Holdco's general partner.[57]

After the Transaction closed, Clark and Linville continued to serve as the Company's President and CEO, respectively, and remained on the Agspring board of managers.[58] During the ensuing months, Clark and Linville continued to represent that Agspring's future financial outlook was strong and blamed any financial struggles of Agspring on market problems.[59]

In or around June 2016, after Agspring's 2016 fiscal year ended on May 31, 2016, Agspring reported that its total FY16 EBITDA was only $701,900, with Big River contributing $655,000 of that amount—a tiny fraction of the $33 million in total EBITDA reflected in the forecast that Agspring provided to AIM and the

---

[56] Term Loan Agreement at AGS-AAA00012901; ABL Credit Agreement at CLARK004754.

[57] Compl. ¶ 103; MIPCA §§ 2.3, 2.6(e), Ex. C.

[58] Compl. ¶¶ 21-22, 106.

[59] *Id.* ¶¶ 107, 113.

Investor LLCs in late November 2015 before Transaction closed.[60] Soon after these results were reported, Clark and Linville provided notice of their resignations.[61] Their employment ended officially on July 25, 2016.[62]

On June 28, 2016, shortly after Clark and Linville gave notice of their intention to resign, they were advised in writing "to preserve any and all documents . . . relating in any way to Agspring's business."[63] Despite this instruction, Clark and Linville did not return their computers to Agspring when their employment ended and resisted demands for the return of their computers.[64]

After Clark and Linville eventually returned their computers to Agspring, Plaintiffs learned that Linville had performed a factory reset on his computer on July 11, 2016, which deleted and rendered forensically unrecoverable all documents and data on the computer.[65] Upon discovering Linville's actions, Holdco began to investigate the conduct of Clark, Linville, and NGP surrounding the sale of Agspring in December 2015.[66]

---

[60] *Id.* ¶ 116.

[61] *Id.* ¶ 117.

[62] *Id.*

[63] *Id.* ¶ 121.

[64] *Id.*

[65] *Id.* ¶¶ 122-23.

[66] *Id.* ¶ 124.

12

After its 2016 fiscal year, Agspring continued to struggle financially. Its lenders served Agspring with a notice of default almost immediately after its results for the 2016 fiscal year were disclosed.[67] The Company restructured in September 2017 and again in August 2018, but has been unable to service the $80 million in loans from HVS and LVS it incurred in connection with the Transaction and has been unable to pay the Tubbs Note.[68]

## II.  PROCEDURAL HISTORY

On April 12, 2019, Plaintiffs filed their initial complaint in the Delaware Superior Court (the "Original Complaint"), which they amended on June 6, 2019, and again on July 10, 2019.[69] On July 17, 2019, the Superior Court transferred the case to the Court of Chancery under 10 *Del. C.* § 1902.[70]

On July 24, 2019, Plaintiffs re-filed in this court their second amended complaint from the Superior Court action.[71] On October 24, 2019, Plaintiffs filed their Verified Amended Complaint (as defined above, the "Complaint"). The Complaint asserts six claims for fraud (Count I), aiding and abetting fraud (Count

---

[67] *Id.* ¶ 144.

[68] *Id.* ¶¶ 118, 144, 193.

[69] *Agspring Holdco, LLC v. NGP X US Hldgs., L.P. et al.*, C.A. No. N19C-04-134 AML ("Superior Court Action") Dkt. 1 ("Original Compl."); *id.* Dkt. 7; *id.* Dkt. 18.

[70] Superior Court Action Dkt. 19.

[71] Dkt. 1. The factual allegations in the July 24 and July 10 complaints are identical. *Compare* Dkt. 1 *with* Superior Court Action Dkt. 18.

II), civil conspiracy (Count III), breach of fiduciary duties (Count IV), unjust enrichment (Count V), and indemnification under the MIPCA (Count VI).

On November 25, 2019, NGP moved to dismiss Counts I through V of the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.[72] On December 11, 2019, Clark and Linville moved to dismiss Counts I, III, and IV under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.[73]

## III. ANALYSIS

The gravamen of the Complaint is that Defendants deceived Plaintiffs to induce them to enter into the MIPCA and related agreements by providing them with an artificially inflated financial model containing a forecast that was millions of dollars higher than Agspring's actual internal model to justify the price that NGP was demanding in the Transaction, *i.e.*, one that would provide NGP a two times return on its initial investment of $150 million.[74] In particular, Plaintiffs contend that in the weeks before the MIPCA was signed in December 2015, after the first half of Agspring's 2016 fiscal year was over, Clark and Linville represented to AIM and the Investor LLCs that Agspring was forecasting its EBITDA for the full 2016 fiscal year at $33 million (with $22 million attributable to Thresher and $10 million

---

[72] Dkt. 34.

[73] Dkt. 39.

[74] Compl. ¶¶ 180, 209.

14

attributable to Big River) when, in reality, the Company had reduced its internal forecast for FY16 EBITDA by more than 39 percent—to approximately $20 million (with $15 million attributable to Thresher and $5 million attributable to Big River). According to Plaintiffs, this scheme concealed that they were grossly overpaying to acquire Agspring and that the Company would be too leveraged to pay its existing debt and the financing contemplated for the acquisition.

As a threshold matter, all Defendants contend that Counts I-V should be dismissed as untimely because they were filed more than three years after the Transaction closed on December 14, 2015. For the reasons explained in Part III.A, the court concludes that these claims are not time-barred.

Next, NGP contends that Counts I-V each fail to state claims for relief under Court of Chancery Rule 12(b)(6) for a variety of reasons. Clark and Linville, who are named as defendants in three of the first five claims (Counts I, III, and IV), join in NGP's arguments but advance no arguments on the merits specific to themselves. These issues are addressed in Parts III.B-E. The standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate

15

unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[75]

## A.      Whether Counts I-V are Time-Barred

Counts I-V consist of a mix of legal and equitable claims but they each seek solely legal relief, *i.e.*, money damages.[76]  Absent the existence of "extraordinary circumstances,"[77] which has not been argued here, or the application of tolling doctrines, which is addressed below, the Court of Chancery should apply the statute of limitations "strictly" to legal claims seeking legal relief and apply the statute of limitations by analogy to equitable claims seeking legal relief "with at least as much and perhaps more presumptive force" given the "quasi-legal status" of such claims.[78]

The statute of limitations for each of the claims at issue here is three years.[79] "The statute of limitations begins to run at the time the cause of action accrues, which

---

[75] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal citations omitted).

[76] *See* Compl. at 73 (Request for Relief).

[77] *See Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 976-78 (Del. Ch. 2016) (discussing *O'Brien v. IAC/Interactive Corp.*, 2009 WL 2490845 (Del. Ch. Aug. 14, 2009), *aff'd*, 26 A.3d 174 (Del. 2011) and *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764 (Del. 2013)).

[78] *Id.* at 983.

[79] 10 *Del. C.* § 8106; *see In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 812 (Del. Ch. 2009) (fiduciary duty and fraud), *aff'd sub nom. Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) (TABLE); *Clark v. Davenport*, 2019 WL 3230928, at *16 (Del. Ch. July 18, 2019) (aiding and abetting); *Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062, 1064 (Del. Ch. 1989) (civil conspiracy); *Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at *13 (Del. Ch. Feb. 18, 2015) (unjust enrichment).

16

is generally when there has been a harmful act by a defendant[,] . . . even if the plaintiff is unaware of the cause of action or the harm."[80]

The parties appear to agree that Counts I-V accrued on December 14, 2015, the date the MIPCA was signed and the Transaction closed.[81] This is the correct date because the alleged harm to Plaintiffs occurred when Holdco became the owner of Agspring based on allegedly fraudulently statements made in the MIPCA and the Term Loan Agreement. The Original Complaint was filed on April 12, 2019, outside of this three-year period. Thus, for Counts I-V to survive dismissal, Plaintiffs must plead facts sufficient to toll the statute of limitations to at least April 12, 2016.

Plaintiffs advance two theories of tolling: fraudulent concealment and equitable tolling. "Fraudulent concealment requires an affirmative act of concealment by a defendant—an actual artifice that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry."[82] "[T]he doctrine of equitable tolling stops the statute from running while a plaintiff has reasonably relied upon the competence and good faith

---

[80] *In re Tyson Foods Inc.*, 919 A.2d 563, 584 (Del. Ch. 2007).

[81] *See* C&L Opening Br. 17 (Dkt. 40); NGP Opening Br. 8-9 (Dkt. 38); Pls.' Opp'n Br. 27 (Dkt. 46). Although Clark and Linville's brief states that the claims against them accrued "on or before December 14, 2015," they provide no explanation why the harm to Plaintiffs would have occurred before the Transaction closed and Holdco assumed ownership of Agspring, and none is apparent to the court. *See* C&L Opening Br. 17.

[82] *Ryan v. Gifford*, 918 A.2d 341, 359-60 (Del. Ch. 2007) (internal quotation marks omitted).

of a fiduciary."[83] "Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them."[84]

Under either of these theories, "a plaintiff bears the burden of showing that the statute was tolled, and relief from the statute extends only until the plaintiff is put on inquiry notice."[85] In other words, neither theory "will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong."[86] As the party asserting that tolling applies, Plaintiffs "bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled."[87] Allegations of fraudulent concealment must be plead with the particularity as required under Court of Chancery Rule 9(b).[88]

Plaintiffs contend they "were not on inquiry notice of their claims until sometime after July 2016," after the Company disclosed disastrous results for its

---

[83] *In re Tyson Foods*, 919 A.2d at 585.

[84] *Krahmer v. Christie's Inc.*, 903 A.2d 773, 778 (Del. Ch. 2006) (internal quotation marks and citation omitted).

[85] *In re Tyson Foods*, 919 A.2d at 585.

[86] *Id.*; *see also Pomeranz v. Museum P'rs, L.P.*, 2005 WL 217039, at *13 (Del. Ch. Jan. 24, 2005) ("Once a plaintiff is on notice of facts that ought to make her suspect wrongdoing, she is obligated to diligently investigate and to file within the limitations period as measured from that time.").

[87] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998); *see also CertainTeed Corp. v. Celotex. Corp.*, 2005 WL 217032, at *6 (Del. Ch. Jan. 24, 2005).

[88] *Boeing Co. v. Shrontz*, 1992 WL 81228, at *3 (Del. Ch. Apr. 20, 1992).

2016 fiscal year and Clark and Linville abruptly resigned from their positions as President and CEO of the Company.[89] The court considers this argument first with respect to Clark and Linville, and then with respect to NGP.

### 1. Tolling of Claims Against Clark and Linville

In support of their fraudulent concealment theory, the Complaint pleads that Clark and Linville took the following actions to conceal their fraud after the Transaction closed in December 2015 and while they continued to serve as officers of Agspring until July 2016:[90]

- In January 2016, Clark and Linville said in materials sent to the Investor LLCs that Big River's FY16 EBITDA of $10 million remained "on target."[91]

- At a January 2016 board meeting attended by the Investor LLCs, Clark and Linville informed the attendees that (i) Big River "was back on track and doing well," (ii) Thresher's FY16 EBITDA forecast would be reduced by $2 million and "would now be $20 million," (iii) Agspring's consolidated EBITDA "would soon reach the $30-33 million range" that was projected before the MIPCA was signed, and (iv) the Company would be able to make quarterly distributions to the Investor LLCs of roughly $4.5 million per quarter starting in February 2016.[92]

- In March 2016, Agspring sent AIM a message, which it relayed to the Investor LLCs, that the "'market [was] causing worse performance'

---

[89] Pls.' Opp'n Br. 37.

[90] Compl. ¶ 106.

[91] *Id.* ¶ 108.

[92] *Id.* ¶¶ 109, 110, 112.

than expected, even though the company was in compliance with its debt covenants."[93]

- Based on information it received from Clark and Linville as of March 28, 2016, AIM told the Investor LLCs and other investors that it had not "lost any faith in the assets and next year could easily be over $40mm ebitda."[94]

- On April 15, 2016, when the Investor LLCs asked for a comparison of actual to forecasted financial results, Clark instructed Agspring's CFO (Chris Stratton) not "to send any forecast or March [2016] actuals" but only to send "YTD through [February 2016]"[95]

- In July 2016, after Clark and Linville provided notice of their intent to resign in June and were advised in writing to preserve all documents, Clark and Linville left Agspring without returning their Company computers and, when they ultimately did so, it was discovered that Linville had deleted "all documents and data" on his computer, making that information unrecoverable.[96]

Viewed in their totality, these allegations plead facts with sufficient particularity to show that Clark and Linville made affirmative efforts to conceal the fraud they allegedly committed in connection with the sale of the Company during

---

[93] *Id.* ¶ 113.

[94] *Id.* ¶ 114.

[95] *Id.* ¶ 115. Clark and Linville contend this allegation is "deliberately misleading" because the email underlying this allegation states not to send "any forecast or March actuals *in that package yet*," which they contend implies that "the information was withheld temporarily because the forecast estimate was 'sent over late.'" C&L Reply Br. 10 (Dkt. 59) (quoting Juray Aff. Ex. 6). Although this is a reasonable inference, it is not the only reasonable inference one could make from the email. Discovery should show if and when any forecast and/or the "March actuals" were sent out after this email was sent, whether either was altered, and the reason for the delay.

[96] *Id.* ¶¶ 121-23.

20

the seven months after the Transaction closed when they were in charge of its operations. In particular, they made statements to perpetuate the myth that the artificially inflated forecast they provided to AIM and the Investor LLCs shortly before the closing remained achievable when they knew otherwise. The alleged destruction of information on Linville's computer stands out as a deliberate effort to impede the investigation they inferably knew was coming.[97]

Defendants make essentially two arguments for why Plaintiffs were on inquiry notice before July 2016. Neither is persuasive.

Defendants' primary argument is that Plaintiffs were on inquiry notice as of December 14, 2015, the date the Transaction closed, because "the entire purported factual basis" for Plaintiffs' claims against them "is taken from documents, communications and information" that were deemed "delivered" to Holdco under the MIPCA when the Transaction closed.[98] For support, Defendants rely heavily on *CertainTeed Corporation v. Celotex Corporation*, where the court noted that plaintiff's fraudulent concealment claim was undermined by its "own dominion" over facilities CertainTeed had acquired from Celotex in an asset purchase because

---

[97] Clark and Linville quarrel that "Plaintiffs do not allege that Linville deleted any unique documents" from his computer. C&L Reply Br. 10. This argument is mystifying. One cannot know what is not knowable. Having pled with particularity that Linville made the information on his Company computer forensically unrecoverable after expressly being advised to preserve all documents, the court reasonably may infer that he sought to impede any attempt to investigate his actions.

[98] C&L Opening Br. 18-19 (citing MIPCA § 3.3(c)); NGP Opening Br. 16-17 (same).

plaintiff could discover "the non-compliant conditions [at those] facilities almost immediately upon assuming ownership."[99]  Significantly, the court made those comments where, unlike in this case, CertainTeed failed to allege any "post-Closing acts by Celotex attempting to cover up non-complaint conditions at the Facilities"[100]

The logic of Defendants' argument is that, once Holdco had taken legal possession of the Company's records, it immediately should have begun investigating the CEO and President of the Company it had just acquired even though Plaintiffs had no ostensible reason to suspect them of wrongdoing at that time, as evidenced by the fact that they structured the deal to retain the management team.  This proposition runs counter to the notion that the owners of an entity should be able to rely in good faith on their fiduciaries.[101]  To my mind, it would be inequitable to allow Defendants to "wield a limitations defense" on this theory given the post-close allegations of concealment recited above.[102]

---

[99] 2005 WL 217032, at *8.

[100] *Id.*

[101] *See In re Am. Int'l Gp.*, 965 A.2d at 812 ("But, the only reason that it took so long to bring any of these claims is because AIG's public filings, upon which its stockholders were entitled to rely, concealed the wrongdoing."); *In re Tyson Foods*, 919 A.2d at 591 ("Plaintiffs were entitled to rely upon the competence and good faith of those protecting their interests"); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 646 (Del. Ch. 2013) ("The plaintiffs were entitled to rely on the board members to not use the Series D Financing to enrich themselves and their affiliated funds.").

[102] *In re Am. Int'l Gp.*, 965 A.2d at 813.

Secondarily, Defendants argue Plaintiffs were on inquiry notice in January 2016 when Clark and Linville told the Agspring board that the FY16 EBITDA forecast for Thresher would be reduced from by $2 million, or at least by March 2016 when Agspring employees circulated to the Investor LLCs documents attributing the company's "financial struggles" to "Market Headwinds."[103] Reducing the Company's EBITDA forecast by a relatively modest amount (approximately 6% of the $33 million EBITDA forecast provided before the closing) and attributing poor results to market conditions, however, would not necessarily "have led a prudent person of ordinary intelligence to inquire" into whether their fiduciaries were engaged in wrongdoing.[104]

To the contrary, these events reasonably could be viewed as reassuring. At the same meeting they told the board the FY16 EBITDA forecast for Thresher would be reduced by $2 million, for example, Clark and Linville commented that Big River "was back on track," that Agspring's consolidated EBITDA "would soon reach the $30-33 million range" projected before the MIPCA was signed, and that the

---

[103] Compl. ¶ 113.

[104] *Coleman v. PricewaterhouseCoopers, LLC*, 854 A.2d 838, 843 (Del. 2004) (reversing trial court's grant of summary judgment based on the statute of limitations because "there was no 'red flag' that clearly and unmistakably would have led a prudent person of ordinary intelligence" to make inquiry); *see also In re Tyson Foods*, 919 A.2d at 591 ("reasonable diligence" does not include an "obligation to sift through a proxy statement . . . and a year's worth of press clippings and other filings . . . in order to establish a pattern concealed by those whose duty is to guard the interests of the investor.").

Company's financial position was strong enough to permit it to distribute approximately $4.5 million per quarter to the Investor LLCs beginning the next month.[105]  Similarly, as of late March 2016, AIM took from management's comments that the Company "could easily be over $40mm ebitda" next year.[106]

For the reasons discussed above, the court concludes that, insofar as Clark and Linville are concerned, the Complaint's allegations concerning their affirmative acts of concealment after the Transaction closed toll the limitations period until late July 2016, when the Company learned that Linville had deleted all of his records from his Company computer.  Because all of these acts occurred while Clark and Linville continued to serve as fiduciaries of Agspring, the statute of limitations also is tolled under the doctrine of equitable tolling, which "stops the statute from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary."[107]

Clark and Linville contend that equitable tolling "only applies to claims of wrongful self-dealing."[108]  But, as then-Vice Chancellor Strine explained in *In re American International Group, Inc.*, "although [one] can point to some case law support for that assertion," that position does not appear to be "an accurate reflection

---

[105] Compl. ¶¶ 109, 112.

[106] *Id.* ¶¶ 113-14.

[107] *In re Tyson Foods*, 919 A.2d at 585.

[108] C&L Opening Br. 27 (citing *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008)).

of our law" because the "obvious purpose of the equitable tolling doctrine is to ensure that fiduciaries cannot use their own success at concealing misconduct as a method of immunizing themselves from accountability for their wrongdoing."[109] Indeed, in a seminal decision, our Supreme Court recognized the broader principle that where fiduciaries "are required to answer for wrongful acts of commission by which they have enriched themselves to the injury of the corporation," they will be "without the protection of the statute of limitations."[110] Here, the Transaction enriched Clark and Linville to the tune of approximately $7.5 million in cash payments (about $3.8 million for Clark and $3.7 million for Linville) based on an allegedly inflated valuation of the Company that was the product of their fraud. This is an appropriate circumstance for the application of equitable tolling in my view.

In sum, the claims in the Complaint asserted against Clark and Linville are not time-barred based on the doctrines of fraudulent concealment and equitable tolling.[111]

---

[109] 965 A.2d at 813 (collecting authorities).

[110] *Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808, 820 (Del. 1944).

[111] Clark and Linville do not argue, and thus waive as an issue, that any of the claims in the Complaint asserted against them specifically should not relate back to the Original Complaint, which was timely filed within three years of July 2016. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (issues not briefed are deemed waived).

## 2. Tolling of Claims Against NGP

All of the acts of fraudulent concealment discussed above were taken by Clark and Linville. As discussed later in this decision, however, Plaintiffs allege facts sufficient to state a claim that NGP knowingly engaged in a conspiracy with Clark and Linville to make the fraudulent misrepresentations at the heart of this case.[112] In this circumstance, as our Supreme Court recognized in *Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, those who conspire to defraud with fiduciaries who enrich themselves should be bound by the same standard for statute of limitations purposes as the fiduciaries themselves.[113]

NGP argues this rule should not apply because the concealment by Clark and Linville occurred after the Transaction closed, when the alleged conspiracy with NGP terminated. The court disagrees. As *Laventhol* recognizes, the rule recited above is "one of policy."[114] As a matter of policy, there is no equity in allowing one co-conspirator to be treated differently than a second for statute of limitations purposes merely because the second concealed the fraudulent conduct that was the product of the conspiracy after the first exited the scene. Rather, as the *Laventhol* court put it, "both classes of defendants . . . stand in the same position under the

---

[112] *See infra* Part III.C.2.

[113] 372 A.2d 168, 170-71 (Del. 1976).

[114] *Id.* at 170.

26

principles of law governing the merits of the complaint and there is, therefore, no reason why the principles of law governing the applicability of the statute of limitations should not apply in like manner."[115]  For these reasons, the court finds that, insofar as NGP is concerned, the limitations period is tolled until late July 2016, as it is for Clark and Linville.

In the Original Complaint, which was timely filed on April 12, 2019, Holdco asserted a claim for fraud against Clark and Linville and a claim for unjust enrichment against NGP that was "the result of the fraud and willful misconduct committed by Clark and Linville in fraudulently inducing plaintiff to acquire Agspring."[116]  The Complaint, which was filed on October 24, 2019, added four claims against NGP for fraud, aiding and abetting, civil conspiracy, and breach of fiduciary duty.  NGP argues that these claims do not relate back to the Original Complaint because that pleading "failed to allege any wrongdoing by NGP and therefore failed to adequately notify NGP of the basis for their not-yet-filed claims."[117]  The court disagrees.

Court of Chancery Rule 15(c) allows relation back of amendments when "the claim or defense asserted in the amended pleading arose out of the conduct,

---

[115] *Id.* at 170-71.

[116] Original Complaint ¶ 94.

[117] NGP Opening Br. 23.

transaction or occurrence set forth or attempted to be set forth in the original pleading."[118]  As our Supreme Court has explained, "[t]he relation-back doctrine obviates the force of the statute of limitations in certain situations to encourage the disposition of litigation on its merits."[119]  An amendment may "change[] the legal theory on which the action initially was brought" so long as the "factual situation upon which the action depends remains the same and has been brought to defendant's attention by the original pleading."[120]

Here, the fraud alleged in the Original Complaint arose out of the same transaction as the fraud at issue in the current Complaint—Holdco's acquisition of Agspring from NGP and the management investors under the MIPCA—and out of the same conduct, albeit with additional factual details.  The Original Complaint, for example, specifically alleges that "Clark and Linville . . . intentionally misrepresented that the financial models and forecasts of future earnings that AIM and its lenders used to evaluate the transaction were prepared in good faith and were based on current information" when, "unknown to buyers, Clark and Linville

---

[118] Ch. Ct. R. 15(c)(2).

[119] *Chaplake Hldgs., Ltd. v. Chrysler Corp.*, 766 A.2d 1, 6 (Del. 2001) (internal quotation marks and citation omitted).

[120] *Vadala v. Henkels & McCoy, Inc.*, 397 A.2d 1381, 1382-83 (Del. Super. 1979) (internal quotation marks and citation omitted)

28

artificially manipulated Agspring's financial model and EBITDA forecast, inflating it by millions of dollars to 'forecast' a number they had preselected."[121]

The same transaction and conduct underlying the fraud in both the Original Complaint and the current Complaint also underlies the other three claims asserted against NGP in the Complaint, *i.e.*, the two claims based on secondary theories of fraud (aiding and abetting and conspiracy) as well as the claim for breach of fiduciary duty. With respect to the final claim, the Complaint specifically alleges that by "conspiring to commit fraud and then committing fraud and misrepresenting Agspring LLC's financial standing and outlook, Clark and Linville, and NGP breached their fiduciary duties to Agspring LLC and acted in bad faith."[122]

Given that all four of the additional claims against NGP arise out the same transaction and conduct plead in the Original Complaint, the Complaint relates back to the Original Complaint under the plain language of Rule 15(c). This result accords with the purpose of Rule 15(c)—the disposition of litigation on the merits[123]—and

---

[121] Original Complaint ¶ 7; *see also id.* ¶¶ 8, 35, 38, 40-41.

[122] Compl. ¶ 225.

[123] *Chaplake*, 766 A.2d at 6; *see also* Daniel R. Coquilette, Gregory P. Joseph, Georgene M. Vairo & Chilton Davis Varner, *Moore's Federal Practice* § 15.02[1] (3d ed. 2020) ("The Rule [15(c)] allows for liberal amendment in the interests of resolving cases on the merits.").

can hardly be a surprise to NGP, which was sued in the Original Complaint for over $100 million in damages as the "unjust" product of a fraud claim.[124]

NGP's reliance on *Moore ex rel. Moore v. Emeigh* does not compel a different conclusion. There, the Supreme Court concluded that the Superior Court acted "well within its discretion in holding that a new claim did not relate back" where the new claim presented "an independent theory of liability based on independent facts that were not set forth in the original complaint."[125] Here, as discussed above, the additional claims against NGP involve a different theory of liability, but the core facts underlying those claims arise out of the same transaction and conduct plead in the Original Complaint, which satisfies the requirements of Rule 15(c).

In sum, for the reasons explained above, Counts I-IV of the Complaint relate back to the Original Complaint and all of the claims in the Complaint asserted against NGP (Counts I-V) are not time barred.

## B. Count I: Fraud Claims Against Clark, Linville, and NGP

In Count I of the Complaint, Holdco and the Investor LLCs assert claims for fraud against Clark, Linville, and NGP based solely on express representations in three agreements: the MIPCA, the Term Loan Agreement, and the ABL Credit Agreement. Count I does not assert a claim for fraud based on any extra-contractual

---

[124] Original Complaint at 29 (Request for Relief ¶ A).

[125] *Moore ex rel. Moore v. Emeigh*, 935 A.2d 256 (Del. 2007) (TABLE).

30

representations.[126] Before turning to the specific theories of fraud subsumed within Count I, three points of clarification are in order.

First, the Complaint does not identify a party to this action that loaned funds under the ABL Credit Agreement, a working capital credit facility in which Agspring (as borrower) made various representations for the benefit of lenders under that facility. Macquarie Bank Limited is a party to the ABL Credit Agreement but it is not a party to this action and the Complaint does not identify, much less name as a party to this action, any other lender under the facility. Accordingly, Count I will be dismissed insofar as it is based on a representation in the ABL Credit Agreement because the Complaint fails to name as a party to this action any counterparty to that agreement that could have relied on such representation.[127]

Second, whether by design or inadvertence, the Complaint lacks precision as to which entity is asserting fraud claims under the other two agreements. Holdco is a party to the MIPCA but is not a party to the Term Loan Agreement. Two of the Investor LLCs (LVS and HVS) are parties to the Term Loan Agreement, but none of the Investor LLCs are parties to the MIPCA. Accordingly, this decision proceeds on the assumption that Holdco is asserting fraud claims based on representations in

---

[126] Mot. to Dismiss Hr'g Tr. 82 (Apr. 16, 2020) (Dkt. 70).

[127] The Complaint challenges only one representation in the ABL Credit Agreement, which is the same as the one in Section 4.06 of the Term Loan Agreement discussed below.

31

the MIPCA and that LVS and HVS are asserting fraud claims based on the representations in the Term Loan Agreement.

Third, as noted above, Clark and Linville joined in NGP's motion to dismiss the fraud claim but advanced no arguments of their own. Thus, Clark and Linville have conceded issues concerning the fraud claim unique to them that NGP did not brief, such as the issue of knowledge.

To state a fraud claim under Delaware law, a plaintiff must allege: "(i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages."[128] The court analyzes the fraud claims with respect to the MIPCA and the Loan Agreement, in turn, below.

### 1. MIPCA Fraud Claims

In Article IV of the MIPCA, NGP and the "Management Investors," which include Clark and Linville, "severally and not jointly" made a series of representations to Holdco, as the successor to Agspring LP.[129] Holdco asserts that

---

[128] *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015) (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).

[129] MIPCA Art. IV.

three of these representations support claims for fraud: Sections 4.5(c), 4.8, and 4.15(m).

NGP advances two arguments in response. NGP first argues that "Plaintiffs' fraud claims that are based on provisions of the MIPCA are barred by the economic loss doctrine . . . because a plaintiff may not recover in tort for breaches of contract agreements."[130] This contention is without merit. This court's precedents recognize that a buyer may sue for fraud based on false representations in a contract that induce the buyer to enter into the contract.[131]

NGP's second argument is that the Complaint fails to plead fraud with the requisite particularity. Under Court of Chancery Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."[132] "The relevant circumstances are 'the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the

---

[130] NGP Opening Br. 23-24 (internal quotation marks and citation omitted).

[131] *See, e.g., Abry P'rs V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1054 (Del. Ch. 2006) ("[B]uyers claiming to be the victims of [contractual] representations have traditionally been able to seek to avoid a contract (or in the alternative, recover damages) in either contract or tort."); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145-47 (Del. Ch. 2003) (allowing a claim for fraud to proceed based on alleged false representations made in a purchase agreement).

[132] Ch. Ct. R. 9(b).

misrepresentation.'"[133]   The key to determining whether a plaintiff has alleged circumstances with particularity to satisfy Rule 9(b) is that "the plaintiff must allege circumstances to fairly apprise the defendant of the basis of the claim."[134]

"When a party sues based on a written representation in a contract," as Holdco has done here, "it is relatively easy to plead a particularized claim of fraud."[135]  This is because the "plaintiff can readily identify who made what representations where and when, because the specific representations appear in the contract."[136]

NGP challenges the sufficiency of the Complaint's allegations with respect to three of the five elements of a fraud claim:  the existence of a false representation, knowledge, and damages.[137]  The court addresses these issues in that order.

---

[133] *Prairie Capital*, 132 A.3d at 62 (quoting *Trenwick Am. Litig. Tr. v. Ernst & Young LLP*, 906 A.2d 168, 207-08 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007)).

[134] *H-M Wexford*, 832 A.2d at 145.

[135] *Prairie Capital*, 132 A.3d at 62.

[136] *Id.*

[137] In its briefs, NGP challenged the element of justifiable reliance based on its understanding that Plaintiffs' fraud claim was based, at least in part, on extra-contractual representations.  This issue became moot when Plaintiffs clarified at oral argument that their fraud claim is not based on extra-contractual representations and is only based on express contractual representations.  *See* Tr. 82.  To be clear, no basis would exist to challenge Plaintiffs' reliance on the representations in the MIPCA, which expressly provides that Holdco has relied and would rely on those representations.  MIPCA § 9.11(b); *see also Prairie Capital*, 132 A.3d at 62. ("It is reasonably inferable that defendants intended to induce reliance on the representations because they appeared in a written agreement.  For the same reason, it is reasonably inferable that the plaintiff relied on representations when entering into the agreement.").

34

### a. False Representation

Defendants argue that two of three MIPCA provisions at issue (Sections 4.5(c) and 4.8) cannot give rise to a fraud claim because they are not representations of existing fact, and that the express terms of the third provision (Section 4.15(m)) precludes Holdco's argument. For the reasons discussed below, the court finds it is reasonably conceivable based on the Complaint's allegations that the representations in Sections 4.5(c) and 4.15(m) were false when made but that Holdco has failed to make this showing with respect to the representation in Section 4.8 of the MIPCA.

### i. Section 4.5(c) of the MIPCA

Section 4.5(c) provides in relevant part that:

> [T]o the knowledge of Agspring, no event has occurred or circumstance exists that (with or without notice or lapse or time) may . . . result in a material violation or material breach of, or give any Agspring Entity or any other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify, any Material Contract.[138]

It is not disputed that the Tubbs Note, which had an outstanding principal balance of $22 million and required the Company to pay $1.2 million in interest annually,[139] was a "Material Contract" when the MIPCA was signed. Holdco contends Defendants knew when they made the representation in Section 4.5(c) that

---

[138] MIPCA § 4.5(c).

[139] Compl. ¶ 37.

35

the effect of Agspring's poor performance during the first six months of its 2016 fiscal year, which Defendants knew about but did not fully disclose before they signed the MIPCA in December 2015, put the Company on a downward spiral that would cause a default of the Tubbs Note. To that end, the Complaint alleges the Company earned only $701,900 of EBITDA (instead of a projected $33 million) for its full 2016 fiscal year, which ended on May 31, 2016; had to restructure twice, in September 2017 and August 2018; and failed to make payments on the Tubbs Note starting in October 2018.[140]

Defendants counter that "Holdco cannot point to an 'event or occurrence' that *had* occurred as of December 2015 that should have led NGP to conclude Agspring would violate a loan covenant *34 months later*."[141] Relying on *Edinburgh Holdings Inc. v. Education Affiliates, Inc.*, Defendants also contend that Section 4.5(c) cannot give rise to actionable common law fraud because it amounts to a prediction about the future.[142]

The Complaint pleads numerous facts demonstrating that Agspring experienced a serious financial decline at Big River and "catastrophic" results at Thresher during the six months leading up to the closing.[143] The severity of the

---

[140] *Id.* ¶¶ 37, 116, 118.

[141] NGP Reply Br. 21-22 (Dkt. 58).

[142] 2018 WL 2727542, at *12 (Del. Ch. June 6, 2018).

[143] Compl. ¶¶ 70-71, 81-83.

decline caused the Company, unbeknownst to Holdco, to reduce its FY16 EBITDA forecast by more than 39 percent—from $33 million to $20 million before the closing. Given the sharpness of the financial decline the Company had experienced before the closing and the known fact that the Company would be incurring $80 million of additional debt in connection with the Transaction,[144] it is reasonably conceivable that, contrary to the representation made in Section 4.5(c), events had occurred that would make it unmanageable for the Company to service its debt and result in a material breach of the Tubbs Note. Thus, the Complaint sufficiently alleges that the express representation to which the parties agreed in Section 4.5(c) was false when made.

Defendants' reliance on *Edinburgh* does not convince me otherwise. There, the court found that "alleged extra-contractual representations regarding revenue projections" were not actionable because it "was not *knowable* at the time" whether the revenues would be achieved.[145] Here, although there is a forward-looking aspect to the representation in Section 4.5(c), the representation is rooted in Agspring's financial condition at the closing based on historical events, *i.e.*, events that had "occurred" and were not only knowable, but allegedly known, at closing.[146]

---

[144] *Id.* ¶ 104

[145] 2018 WL 2727542, at *12 (emphasis in original).

[146] For the same reasons, NGP's footnote citation to *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.* is inapposite. Similar to *Edinburgh*, the challenged statements in

### ii. Section 4.8 of the MIPCA

Section 4.8 of the MIPCA, which is entitled "Sufficiency of Assets," states in relevant part that:

> At the Closing, the Agspring Assets will (a) constitute all of the assets necessary or required to permit the Partnership to carry on the Business in substantially the same manner as historically conducted by the Agspring Entities prior to the Contemplated Transactions and (b) constitute all of the assets of the Agspring Entities used in the Business presently and as conducted since January 1, 2012, other than assets disposed of since January 1, 2012 in the Ordinary Course of Business.[147]

Holdco contends "Defendants knew, when they made the representation in Section 4.8, that the existing assets of Agspring LLC—including Big River and Thresher—would not constitute the assets necessary for Agspring Holdco to carry on Agspring LLC's business 'in substantially the same manner as historically conducted.'"[148] When pressed, it became apparent that Holdco interprets Section 4.8 to mean, in effect, that the assets of the Company would generate financial returns consistent with the past.[149]

---

*Trenwick* concerned "expectation or opinion about the future of the company and the hoped for results of business strategies." *Trenwick Am. Litig. Tr. v. Ernst & Young LLP*, 906 A.2d 168, 209 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007).

[147] MIPCA § 4.8.

[148] Pls.' Opp'n Br. 58.

[149] *See* Tr. 89 (asserting Section 4.8 was false because the business was not "going to be able to carry on substantially in the same manner . . . given the amount of leverage" on the Company and the "absolute bottom having fallen out shortly before close").

This interpretation misconstrues the plain meaning of Section 4.8, which is for a seller to warrant that it will transfer to a buyer at closing all of the operating assets of a business.[150]  As a leading treatise explains, a "sufficiency of assets" representation "will be important for the Buyer to receive comfort from the Seller that the sum of what it is buying comprises all of the assets necessary to run the business."[151]  This interpretation is consistent with the qualification in Section 4.8 that it would not apply to "assets disposed of since January 1, 2012 in the Ordinary Course of Business."[152]  The Complaint does not allege that any assets of the Company necessary to operate its business before the Transaction closed were omitted or missing after the closing.  Accordingly, Holdco's reliance on Section 4.8 fails to state a claim for relief.

### iii.  Section 4.15(m) of the MIPCA

Section 4.15(m) represents "there has not been any . . . Material Adverse Effect" at Agspring since May 31, 2015, which was the end of the Company's 2015

---

[150] *See Weyerhauser Co. v. Lambert*, 2007 WL 2826957, at \*10 (N.D. Ga. Sept. 26, 2017) (interpreting a "sufficiency of assets" representation to mean "no assets used by [sellers] would be inadvertently omitted from the transfer" but did not "guarantee[] that [buyers] would be able to conduct the same . . . business in the future that [sellers] had been conducting"), *aff'd sub nom. In re Paragon Trade Brands, Inc.*, 278 F.App'x 1000 (11th Cir. 2018).

[151] Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 11.04[g], at 11-95 to -96 (2019 ed.).

[152] MIPCA § 4.8.

fiscal year.[153] The term "Material Adverse Effect" is defined in the MIPCA as "any change, circumstance, effect, event, occurrence or condition that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the Agspring Entities, Agspring Assets or the Business, taken as a whole," subject to a series of exceptions.[154]

As this court has explained, "[t]he ubiquitous material adverse effect clause should be seen as providing a 'backstop protecting the acquirer from the occurrence of unknown events that substantially threaten the overall earnings potential of the target in a durationally-significant manner.'"[155] Although "the 'material adverse effect' standard is high, this court will find that a plaintiff has adequately pled a material adverse effect [at the motion to dismiss stage] if the pled facts support a reasonable inference that the misrepresentations 'could produce consequences that are materially adverse to the Company.'"[156]

Relying on an exception in the "Material Adverse Effect" definition in Section 4.15(m) concerning the "the failure or inability . . . to meet any projections, forecasts

---

[153] *Id.* § 4.15(m).

[154] *Id.* Ex. A at A-8.

[155] *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 738 (Del. Ch. 2008) (quoting *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 68 (Del. Ch. 2001)); *see also Frontier Oil v. Holly Corp.*, 2005 WL 1039027, at *34 (Del. Ch. Apr. 29, 2005).

[156] *EMSI Acq., Inc. v. Contrarian Funds, LLC*, 2017 WL 1732369, at *15 (Del. Ch. May 3, 2017) (quoting *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *7-9 (Del. Ch. Nov. 19, 2013)).

or estimates of revenue or earnings,"[157] Defendants contend Plaintiffs are precluded from asserting a claim for fraud based on that representation on the theory that "[w]hat Plaintiffs are really complaining about are lower 'internal forecasts.'"[158] This argument, however, ignores an important carve out to the exception (italicized below) and takes too narrow a view of the Complaint's allegations.

The provision in Section 4.15(m) disallowing consideration of forecasts "in determining whether a Material Adverse Effect has occurred" states in full that one may not consider:

> (i) the failure or inability of the Agspring Entities or the Business to meet any projections, forecasts or estimates of revenues or earnings (*except to the extent that*, with respect to this clause (i) *the facts or circumstances giving rise to such failure or inability may themselves be deemed to constitute, or to be taken into account in determining whether there has been a Material Adverse Effect*)[159]

Drawing all reasonable inferences in Plaintiffs' favor at this stage of the case, as the court must, the Complaint sufficiently pleads facts concerning the circumstances that gave rise to the Company's failure to meet its forecast to support a reasonably conceivable claim that the representation in Section 4.15(m) was false when made.

---

[157] NGP Reply Br. 23 (citing MIPCA Ex. A at A-8).

[158] NGP Opening Br. 30.

[159] MIPCA Ex. A at A-8 (emphasis added).

In particular, the Complaint alleges that in November 2015, when the Company was close to the midpoint of its 2016 fiscal year, the performance of Big River and Thresher since May 31, 2015 had declined dramatically:

- Big River: On November 4, Clark described reduced volumes and margins at Big River as "a material change in performance that impacts our compliance with the bank contract going forward." Those results led Agspring's finance team to believe that Big River's FY16 EBITDA could be just $5 million, or only half of the forecasted amount ($10 million) that Clark and Linville reported to AIM and less than one-third of the amount ($16 million) the Company initially projected.[160]

- Thresher: As reflected in consolidated financial statements for October 2015 that the Company received on November 23, Thresher suffered "catastrophic" results that wiped out all of its year-to-date income, *i.e.*, from June 1, 2015 forward. Those results caused the Company to reduce its internal forecast FY16 EBITDA projection from $22 million to $15 million without telling AIM.[161]

In sum, the Complaint alleges that the Company's performance over the first half of its 2016 fiscal year was so poor that it necessitated a reduction of approximately 47 percent of the Company's total FY16 EBITDA forecast, from $38 million in May 2015 to $20 million in November 2015. This is sufficient to support a reasonable inference of a material adverse effect at the pleadings stage.[162] Accordingly, Plaintiffs have pled that Defendants made a false representation in Section 4.15(m).

---

[160] Compl. ¶¶ 56, 61-65, 68, 71-72.

[161] *Id.* ¶¶ 82-83.

[162] *See Raskin v. Birmingham Steel Corp.*, 1990 WL 193326, at *5 (Del. Ch. Dec. 4, 1990) (Allen, C.) ("While it is possible that on a full record and placed in a larger context one might conclude that a reported 50% decline in earnings over two consecutive quarters

42

### b. Knowledge

The knowledge element of a fraud claim is not subject to the particularity requirement of Rule 9(b). Rather, as Rule 9(b) recognizes, a "defendant's state of mind, including its knowledge and intent, 'may be averred generally.'"[163] The rationale for this rule is that "any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable."[164] "While knowledge may be pled generally, when a plaintiff pleads a claim of fraud that charges that the defendants knew something, it must allege sufficient facts from which it can reasonably be inferred that this 'something' was knowable and that the defendants were in a position to know it."[165]

Clark and Linville advanced no argument challenging the sufficiency of the Complaint's allegations that they knew the representations in the MIPCA at issue

---

might not be held to constitute a material adverse development, it is . . . unlikely to think that that might happen."); *see also Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at \*53 (Del. Ch. Oct. 1, 2018) ("In their influential treatise, Lou R. Kling and Eileen T. Nugent observe that most courts which have considered decreases in profits in the 40% or higher range found a material adverse effect to have occurred.") (citing Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 11.04[9], at 11-66 (2018 ed.)).

[163] *Prairie Capital*, 132 A.3d at 62 (quoting *Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 158 (Del. Ch. 2003)).

[164] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993) (internal quotation marks and citation omitted).

[165] *Abry*, 891 A.2d at 1050.

were false when made, thus conceding the issue. NGP does make such an argument,

but it is not persuasive.

In contending they have adequately pled knowledge with respect to NGP,

Plaintiffs cite the following allegations:

- NGP held 98 percent of Agspring's membership interests and controlled its board through the NGP Board Members (Mark Zenuk, Cameron Dunn, and Richard Edwards), who accounted for three of the five members of Agspring's board.[166]

- NGP Board Members attended board meetings, regularly received financial information, and NGP was contractually obligated to "provide advice and consultation to Agspring LLC" concerning, among other things, "providing general oversight of legal and accounting issues; implementing a long-term budgeting and planning process; mergers and acquisitions; and strategies and financing alternatives."[167]

- NGP was closely involved in the sales process, which included negotiating two price reductions directly with AIM, providing "specific feedback to improve the [Agspring's consolidated financial] statements," encouraging Agspring "employees to add back amounts to EBITDA calculations," and advising Agspring "employees to modify financial documents that were later disclosed to investors so that the company would look more attractive to potential investors."[168]

- NGP "understood that attaining a specific EBITDA was essential to the potential acquirer's value proposition and to secure financing from the Investor LLCs" and that "maintaining consistent financial projections and a positive outlook was key to getting the deal closed."[169]

---

[166] Compl. ¶¶ 5, 20, 28.

[167] *Id.* ¶¶ 30-31, 199.

[168] *Id.* ¶¶ 49, 55, 94, 96, 197-98.

[169] *Id.* ¶¶ 53-55, 95, 157.

- NGP "constantly communicated" with Clark and Linville during the sales process, and specifically, in October 2015, Clark, Linville, and the NGP Board Members discussed Big River's declining volume and margins.[170]

- From October through December 2015, NGP pushed Clark and Linville to close the deal as the Company's forecasts worsened, stating in November "need a close now," and "calling texting, and emailing" Clark and Linville constantly in December 2015.[171]

Contrary to NGP's contention that these allegations should be discounted as "conclusory," they are far more than sufficient to support a reasonable inference that NGP was in a position to know when it signed the MIPCA the knowable reality underlying the alleged falsity of the representations in Sections 4.5(c) and 4.15(m) that was concealed from Plaintiffs, *i.e.*, that Agspring's financial results had declined dramatically over the prior six months necessitating material reductions to its forecast for the 2016 fiscal year, which severely threatened Agspring's earnings and imperiled its ability to service its debt after the closing.

### c. Damages

Defendants contend Plaintiffs have not adequately plead damages. The court disagrees. The Complaint alleges, among other things, that Agspring was worth at least $150 million less than the nearly $300 million Holdco paid for it based on its represented value and that Agspring has been unable to service the $80 million in

---

[170] *Id.* ¶¶ 63, 91, 201.

[171] *Id.* ¶¶ 101, 202.

debt it procured to finance part of the purchase price.[172]  These allegations are sufficient to plead a reasonable inference that Plaintiffs suffered damages as a result of Defendants' alleged fraud.[173]

### 2.  Term Loan Agreement Fraud Claims

LVS and HVS, which together loaned $80 million to Agspring in connection with the Transaction, assert that Defendants made fraudulent representations in two provisions of the Term Loan Agreement that governs their loans.  The first provision, Section 4.06 represents, in general terms, that projections provided by Agspring were prepared in good faith:

> projections, estimates, and pro forma financial information furnished by [Agspring] were prepared in good faith on the basis of assumptions, data, information, tests or conditions believed to be reasonable at the time such projections, estimates, and pro forma financial information were furnished.[174]

The second provision, Section 4.17, contains various representations bearing on Agspring's solvency.  It states in its entirety:

---

[172] Compl. ¶¶ 193, 228, 236; MIPCA § 2.6, Ex. C.

[173] *See H-M Wexford LLC*, 832 A.2d at 144 & n.28 (finding "it reasonably can be inferred that . . . Wexford suffered damages in the form of an overpayment for its investment in Encorp" based on its allegations of a "material adverse change" in Encorp's financial position); *In re Bracket Hldg. Corp. Litig.*, 2017 WL 3283169, at *10 (Del. Super. July 31, 2017) ("[S]ince Bracket asserts that the fraud caused an overpayment for the Company in excess of $50 million, it seems almost silly to dispute the damages element on a motion to dismiss.").

[174] Term Loan Agreement § 4.06.

Immediately following the making of the Loans and after giving effect to the application of the proceeds of the Loans, (a) the fair value of the assets of the Borrower will exceed its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of the Borrower will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) the Borrower will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) the Borrower will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted following the Closing Date.[175]

Clark and Linville do not contend that LVS and HVS have failed to plead adequately all of the elements of fraud with respect to these two representations, nor do they contend they cannot be liable personally if the Complaint's allegations are proven to be true even though Clark and Linville are not parties to the Term Loan Agreement. Thus, this aspect of Count I survives as to them.

NGP similarly does not contend that LVS and HVS have failed to plead adequately all of the elements of fraud with respect to Sections 4.06 and 4.17 of the Term Loan Agreement. But NGP does argue that it cannot be liable for these representations because it is not a party to the Credit Agreement.

LVS and HVS counter that that NGP may be held liable for misrepresentations in the Term Loan Agreement under the "personal participation doctrine" because

---

[175] *Id.* § 4.17.

"NGP directed and empowered Linville and Clark" to enter into the Term Loan Agreement.[176] "Under that doctrine, a corporate officer may be held liable in tort only where she is 'actively involved in the commission of the tort in that she directed, ordered, ratified, approved or consented to the tort.'"[177] The personal participation doctrine has been applied in Delaware in the context of a limited liability company.[178]

Plaintiffs' argument raises what appears to be a novel issue the parties did not address in their briefs, *i.e.*, can the personal participation doctrine be applied to an entity, as opposed to an individual, even if that entity is a controlling member of a limited liability company? The court need not address this question because, for the reasons discussed in Part III.C below, the Complaint sufficiently alleges that NGP may be liable for fraudulent representations in the Term Loan Agreement under both of the secondary liability theories asserted against NGP in the Complaint.

---

[176] Pls.' Answering Br. 63.

[177] *Gassis v. Corkery*, 2014 WL 3565418, at *5 (Del. Ch. July 21, 2014) (quoting *Heronemus v. Ulrick*, 1997 WL 524127, at *2 (Del. Super. July 9, 1997)) (alterations omitted), *aff'd*, 113 A.3d 1080 (Del. 2015) (TABLE); *see also St. James Recreation, LLC v. Rieger Opportunity P'rs, LLC,* 2003 WL 22659875, at *8 n.40 (Del. Ch. Nov. 5, 2003) (citing to *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) for the proposition that "actual participation in wrongful acts is [a] 'crucial predicate' to imposition of individual liability"); *Stonington P'rs, Inc. v. Lernout & Hauspie Speech Prods., N.V.*, 2002 WL 31439767, at *8 n.27 (Del. Ch. Oct. 23, 2002) ("A corporate officer can be held personally liable for the torts he commits and cannot shield himself behind a corporation when he is a participant.").

[178] *See Spanish Tiles, Ltd. v. Hensey*, 2009 WL 86609, at *2 (Del. Super. Jan. 7, 2009).

＊ ＊ ＊ ＊ ＊

For the reasons explained above, the motion to dismiss Count I is granted in part and denied in part. To be more specific, Count I states a direct claim for fraud against all Defendants with respect to the representations in Sections 4.05(c) and 4.15(m) of the MIPCA, and against Clark and Linville with respect to the representations in Section 4.06 and 4.17 of the Term Loan Agreement, but fails to state a claim with respect to the representation in Section 4.8 of the MIPCA.

## C.    Counts II & III:  Secondary Liability Claims Against NGP

In Counts II and III of the Complaint, Holdco and the Investor LLCs assert two different but "quite similar" theories of secondary liability for fraud against NGP:  aiding and abetting and conspiracy.[179]  Given that Plaintiffs have stated a direct claim for fraud against NGP for the two representations in the MIPCA that will survive, these theories are only relevant to the two alleged misrepresentations in the Term Loan Agreement.  For the reasons discussed next, the allegations of the Complaint support the application of both theories against NGP for that purpose.

---

[179] *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *22 (Del. Ch. Nov. 26, 2014) ("As noted, civil conspiracy and aiding and abetting are quite similar.  Indeed, this Court has noted that civil conspiracy claims are 'sometimes called aiding and abetting.'") (quoting *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986)).

49

### 1. Aiding and Abetting

The elements of a claim for aiding and abetting fraud are: "(i) underlying tortious conduct, (ii) knowledge, and (iii) substantial assistance."[180] The first element is a nonissue. Clark and Linville have conceded the viability of the fraud claim against them with respect to the representations in Sections 4.06 and 4.17 of the Term Loan Agreement.

Like the pleading requirements for fraud, the knowledge element of an aiding and abetting claim under Delaware law can be averred generally, and "all that is required to show that a defendant knew something are sufficient well-pleaded facts from which it can reasonably be inferred that this something was knowable and that the defendant was in a position to know it."[181] As discussed above, the Complaint's allegations are more than sufficient to support a reasonable inference that NGP was in a position to know when the Transaction closed about the knowable reality of the fraud underlying the alleged falsity of representations in the MIPCA that was concealed from Plaintiffs, *i.e.*, that Agspring's financial results had declined dramatically over the prior six months necessitating material reductions to its

---

[180] *PR Acqs., LLC v. Midland Funding LLC*, 2018 WL 2041521, at *15 (Del. Ch. Apr. 30, 2018) (internal quotation marks and citation omitted).

[181] *See Great Hill*, 2014 WL 6703980, at *20, *22 (explaining that knowledge in the context of a civil conspiracy claim can be averred generally, and that plaintiffs in the case had adequately plead knowledge for an aiding and abetting fraud claim "for the reasons outlined . . . in connection with the civil conspiracy claim") (internal quotation marks and citation omitted).

forecast for the 2016 fiscal year, which severely threatened Agspring's earnings potential and imperiled its ability to service its debt after the closing.[182] These same allegations satisfy the knowledge element of the aiding and abetting claim with respect to the representations in Sections 4.06 and 4.17 of the Term Loan Agreement.

As to the third element, this court recently explained in an analogous context that "substantial assistance" means that "the secondary actor must have provided 'assistance . . . or participation' in aid of the primary actor's allegedly unlawful acts.'"[183] In that vein, the Complaint alleges that NGP Board Members provided "specific feedback to improve the [Agspring's consolidated financial] statements," encouraged Agspring "employees to add back amounts to EBITDA calculations," and advised Agspring "employees to modify financial documents that were later disclosed to investors so that the company would look more attractive to potential investors."[184] The Complaint further alleges that NGP negotiated two price reductions directly with AIM during the sale process; "constantly communicated" with Clark and Linville during the sales process and gave them "significant heat" to "get the deal done;"[185] and was contractually obligated to "provide advice and

---

[182] *See supra* Part III.B.1.b.

[183] *In re Oracle Corp. Deriv. Litig.*, 2020 WL 3410745, at *11 (Del. Ch. June 22, 2020) (quoting Restatement (Second) of Torts § 876 cmt. d (1979)).

[184] Compl. ¶¶ 55, 94.

[185] *Id.* ¶¶ 91, 101.

consultation" to Agspring concerning various subjects—including "mergers and acquisitions . . . and financing alternatives"—which, it is reasonable to infer, would have put NGP in the thick of the Company's negotiation strategy and tactics throughout the sale process.[186] These allegations satisfy the substantial assistance element.

In sum, Count II states a claim for aiding and abetting fraud against NGP.

### 2. Civil Conspiracy

Holdco and the Investor LLCs asserts that "Clark, Linville, and NGP conspired to fraudulently induce Agspring Holdco and the Investor LLCs to enter into the MIPCA and Term Loan Agreement."[187] The elements for civil conspiracy are: "(i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties."[188] NGP does not challenge the sufficiency of the Complaint's allegations with respect to the second and third elements.

With respect to the first element, "[e]ven to prevail at trial the [plaintiff does] not need to prove the existence of an explicit agreement; a conspiracy can be inferred

---

[186] *Id.* ¶ 31.

[187] *Id.* ¶ 209.

[188] *Great Hill*, 2014 WL 6703980, at *20 (internal quotation marks and citation omitted).

from the pled behavior of the alleged conspirators."[189]  "[T]o survive a motion to dismiss, all that is needed is a reasonable inference that [the defendant] was part of this conspiracy."[190]  Although the "circumstances constituting the fraud or conspiracy to commit fraud" must be pled with particularity under Rule 9(b),[191] "[t]he existence of a confederation may be pled by inference [and] is not subject to the specificity requirement of Rule 9(b)."[192]  In short, "[w]hat matters for purposes of the motion to dismiss" a civil conspiracy claim is whether the complaint alleges "sufficient facts to support an inference that [Defendants] . . . acted in concert" with one another.[193]

Here, the facts recited above concerning NGP's "substantial assistance" with respect to the aiding and abetting claim support a reasonable inference that representatives of NGP worked closely with Clark and Linville throughout the sale process for the purpose of getting a deal done with AIM at a valuation NGP desired and that NGP was aware of the internal reductions to Agspring's FY16 EBITDA

---

[189] *In re Am. Int'l Gp.*, 965 A.2d at 806 (citing *Empire Fin. Servs., Inc. v. Bank of N.Y.*, 900 A.2d 92, 97 n.16 (Del. 2006)); *see also LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2018 WL 1559936, at *16 (Del. Ch. Mar. 28, 2018).

[190] *In re Am. Int'l Gp.*, 965 A.2d at 806.

[191] *Great Hill*, 2014 WL 6703980, at *20 (citing *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005)).

[192] *Id.* (citing *In re Am. Int'l Gp.*, 965 A.2d at 806).

[193] *Prairie Capital*, 132 A.3d at 64; *see also id.* at 63 (explaining that a civil conspiracy claim, but not an aiding and abetting claim, is premised on "someone who takes action 'in concert with the other pursuant to a common design.'").

forecasts that Clarke and Linville concealed from Plaintiffs while providing them inflated ones. Therefore, Count III states a claim for civil conspiracy against NGP.[194]

### D. Count IV: Fiduciary Duty Claim Against Clark, Linville, and NGP

In Count IV, Agspring asserts a claim for breach of fiduciary duty against Clark and Linville, as directors and officers of Agspring, and against NGP, as the controlling member of Agspring before the Transaction closed. That much is clear. Deciphering the point of the claim from the papers has been far more challenging.[195]

---

[194] Citing *Metro Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *19 (Del. Ch. Dec. 20, 2012), NGP contends that a "meeting of the minds" is required to state a claim for civil conspiracy. NGP Opening Br. 45. *Metro Life* articulated the elements of a civil conspiracy claim as follows: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds between or among such persons relating to the object or a course of action; (4) one or more unlawful acts; and (5) damages as a proximate result thereof." 2012 WL 6632681, at *19. It appears that the first three elements of this formulation cover the same terrain as the first element of the three-element test quoted above. Under either formulation, Plaintiffs have stated a claim of civil conspiracy for the reasons explained above.

[195] The briefs advance a mishmash of arguments. The above explanation is the court's distillation of Plaintiffs' key argument. In response, Clark and Linville assert that any purported pre-closing misrepresentations they made are barred by laches. C&L Reply Br. 25. The alleged harm, however, accrued when the Transaction closed and the statute of limitations for Plaintiffs' claims was tolled thereafter until late July 2016. *See supra* Part III.A.1. NGP advances four theories for why the Complaint fails to allege that NGP breached its duty of loyalty, *i.e.*, that (i) the Complaint does not allege NGP provided any falsified projections, (ii) NGP did not make any representations in the Credit Agreements, (iii) "Plaintiffs do not explain how such alleged misrepresentations constitute a breach of any fiduciary duty NGP owed to Agspring," and (iv) Plaintiffs have not met the pleading standard for bad faith. NGP Reply Br. 34-35. The flaw in all of these arguments is that the Complaint sufficiently alleges that NGP knowingly conspired with Clark and Linville to misrepresent the financial condition of the Company, which caused the lenders to finance the Transaction based on misrepresentations in the Term Loan Agreement and caused the Company to become overleveraged and unable to service its debt.

Best the court can tell, Agspring contends that Defendants engaged in a scheme to provide an artificially inflated financial model to Agspring's lenders in connection with the Transaction to provide comfort to the lenders that the Company would generate sufficient EBITDA to finance the Transaction at NGP's desired valuation, which would allow NGP to secure an unfair price and allow Clark and Linville to pull out substantial cash payments at closing for themselves—about $7.5 million. The Company was harmed, it is alleged, because it became overleveraged and was unable to service its debt.[196]

The Complaint pleads that Clark and Linville (i) knew that Agspring had to provide covenants to secure financing,[197] (ii) were concerned about the Company's ability to comply with those covenants,[198] (iii) knew they had to provide better-looking financials than were warranted to justify the valuation NGP desired,[199] (iv) represented to the lenders that "no new forecast was needed" despite knowing that Big River's financial health had declined,[200] and (v) provided artificially-inflated financial information to the lenders;[201] and that Clark ultimately signed the

---

[196] Compl. ¶¶ 227-28.

[197] *Id.* ¶¶ 51, 53.

[198] *Id.* ¶¶ 58, 64.

[199] *Id.* ¶ 66.

[200] *Id.* ¶¶ 66, 67.

[201] *Id.* ¶¶ 86-90.

Credit Agreements on behalf of the Company in his capacity as President of Agspring.[202] For the reasons explained in Part III.C, the allegations of the Complaint also are sufficient to state a claim against NGP for aiding and abetting Clark and Linville in committing fraud in connection with the Term Loan Agreement and, more generally that Clark, Linville, and NGP engaged in a conspiracy to induce the Investor LLCs to enter into the Term Loan Agreement.[203]

Although the court is skeptical that Plaintiffs' fiduciary duty claim, as just articulated, adds much if anything to the mix of this case beyond what their fraud-related claims cover, the claim is reasonably conceivable and its dismissal "will confer no benefit in terms of [the] litigants' economy" because the fiduciary duty claim and the fraud claim will require similar discovery.[204] Accordingly, Count IV survives.

### E.  Count V:  Unjust Enrichment Claim Against NGP

In Count V, Holdco and the Investor LLCs assert a claim for unjust enrichment claim against NGP. The elements of an unjust enrichment claim are: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment

---

[202] *Id.* ¶ 151; *see* Term Loan Agreement at AGS-AAA00012901; ABL Credit Agreement at CLARK004754.

[203] *See supra* Part III.C.1-2.

[204] *Great Hill*, 2014 WL 6703980, at *22.

56

and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[205]

"In evaluating unjust enrichment claims, Courts conduct a threshold inquiry as to whether a contract already governs the parties' relationship."[206] "If a contract comprehensively governs the parties' relationship, then it alone must provide the measure of the plaintiff's rights and any claim of unjust enrichment will be denied."[207] "If the validity of that agreement is challenged, however, claims of unjust enrichment may survive a motion to dismiss."[208]

Section 9.8(a) of the MIPCA states that "the remedies provided for in this Article IX shall be the sole and exclusive remedies of the Partnership Indemnified Parties, the AIM Indemnified Parties and the Agspring Indemnified Parties with respect to this Agreement."[209] It further states that "nothing in this Section 9.8 shall . . . preclude any party from seeking any remedy based upon fraud or willful misconduct."[210] The MIPCA defines the term "Agspring Indemnified Parties" to

---

[205] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[206] *Great Hill*, 2014 WL 6703980, at *27 (internal quotation marks and citation omitted).

[207] *Id.* (internal quotation marks and citation omitted).

[208] *Id.* (citing *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242 (Del. Ch. Oct. 10, 2006)).

[209] MIPCA § 9.8(a).

[210] *Id.*

include NGP and the term "AIM Indemnified Parties" to include Holdco, as the successor to Agspring LP.[211]

The MIPCA is a 61-page contract with representations, warranties, covenants, and indemnities that comprehensively govern the relationship between Holdco and NGP relating to the Transaction. It also expressly addresses the remedies available to both parties, including the ability of Holdco to maintain a claim for fraud against NGP, which Holdco has stated here for the reasons explained above. Plaintiffs have not sought rescission, or to otherwise challenge the validity, of the MIPCA. They seek only money damages.[212] Under these circumstances, based on the principles set forth above, the MIPCA defines the measure of Holdco's rights vis-à-vis NGP and its claim for unjust enrichment fails to state a claim for relief.

NGP is not a party to the Term Loan Agreement. "Delaware courts consistently have held that where a contract exists no person can be sued for breach of contract who has not contracted either in person or by an agent, and . . . that the doctrine of unjust enrichment cannot be used to circumvent this principle merely by substituting one person or debtor for another."[213] "The rationale for this rule is that

---

[211] *Id.* § 9.3.

[212] Compl. at 73 (Request for Relief ¶¶ A-F).

[213] *Vichi v. Koninklijke Philips Elecs., N.V.*, 62 A.3d 26, 59 (Del. Ch. 2014) (internal quotation marks and citation omitted); *see also Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891-92 (Del. Ch. 2009) ("[U]njust enrichment cannot be used 'to circumvent basic

the inability of a party to a contract to fulfill an obligation thereunder cannot serve as a basis to conclude that other entities, *who are not party to the contract*, are liable for that obligation."[214] For this reason, LVS and HVS fail to state a claim for unjust enrichment against NGP with respect to the subject matter of the Term Loan Agreement.

## IV. CONCLUSION

For the foregoing reasons, the court grants in part and denies in part Defendants' motions to dismiss. Counsel are directed to confer and submit a form of implementing order consistent with this decision within five business days.

---

contract principles [recognizing] that a person not a party to [a] contract cannot be held liable to it.'").

[214] *Vichi*, 62 A.2d at 59 (internal quotation marks and citation omitted, emphasis in original).